BROWN v. WATKINS.

Feb. 18, 1952.

No. 38261 (56 So. (2d) 888)

Neill, Clark & Townsend, for appellant.

**Allen & Allen,** for appellee.

**Ethridge, J.**

Appellants, executors of the estate of W. P. Brown, Sr., deceased, appeal from a judgment for $3,000 damages which was rendered in the Circuit Court of Sunflower County against W. P. Brown, Sr., in tort for malicious prosecution of appellee, J. J. Watkins, plaintiff in the court below. While this appeal was pending, W. P. Brown, Sr., died, and the appeal was revived in the names of the deceased's executors. It involves primarily questions of whether there was enough evidence to go to the jury on the issues of want of probable cause and of malice. We think there was.

W. P. Brown, Sr., appellants' deceased, owned a large amount of land constituting several plantations in Sunflower and three other counties in the Mississippi Delta. In 1948 Jack Dickey was general manager for Brown of all these plantations. He testified that early in 1948 he hired appellee Watkins, as manager of the Lombardy Back Plantation in Sunflower County; that in addition to Watkins' monthly salary of $150, his compensation included furnishing him with meat, chickens, and a cow, and that this was furnished to all of the plantation managers. Dickey said that he reported to Brown the terms on

which he hired Watkins and they were agreeable to Brown; and that when a man left the plantation at the end of the year, the usual custom and practice was for the particular manager to take the balance of his meat with him; that this was part of the manager's pay. He stated that he did the hiring of employees, but that Brown had a veto power on those who were hired.

Watkins testified that Dickey hired him for Brown at a salary of $150 per month "with all my meat furnished and a cow and chickens", and that this was customary. Dickey left the employ of Brown in January 1949, but Watkins continued on his job. Watkins said that Brown had furnished him with four hogs and a brood sow; that on December 7, 1949, he had two Negroes who worked on the plantation to kill the four hogs under his supervision; and that on December 12 they were cut and cured and on the same day he took them to the Drew Cold Storage Company and stored the meat there in his name. Watkins said that shortly before he killed the hogs, Crow, the general manager for Brown in 1949, came by his place, and that he told Crow he was going to kill the hogs, to which Crow replied, "All right". Watkins testified that several days later he received word from Brown that he was being discharged from his job effective on January 1, 1950, and that this was the first time he heard of it. He said that Brown sent him word by Crow that he had to return all of the meat he had killed to the plantation, or he was going to run an attachment on it, and that Brown threatened to have him indicted if he didn't return the meat.

On February 23, 1950, Brown executed a criminal affidavit before a justice of the peace charging Watkins with unlawfully, wilfully, fraudulently, and feloniously embezzling four hogs which Watkins had in his custody, and at the same time Brown filed a replevin action for the hogs in the same court. A hearing was had on both charges before the justice of the peace, who found Watkins not guilty on both charges. No indictment was re-

turned against Watkins at the next term of the circuit court of Sunflower County. In January 1951, appellee filed the present action against W. P. Brown, Sr. for the alleged malicious prosecution of appellee by Brown for embezzlement. Appellee's case was substantially as outlined above. In defense, Brown's five witnesses testified in substance that Dickey had no authority to employ Watkins, that Brown himself did all of the hiring, that Brown's practice was to furnish all of his managers as long as they were on the farm with meat for their consumption, but that it was expressly understood that the managers had no right to take and use the meat after they were discharged or resigned their job, and that Watkins understood this rule. Brown used for the plantations an annual "year book". The year books for the years 1948 and 1949 both provided as follows: "We furnish meat to all of our white employees and lots are maintained for this purpose. Managers are not permitted to sell or give meat away. If managers move, meat is to remain at place for the men who succeed them." Defendant's testimony was to the general effect that Watkins had received copies of these year books, and was familiar with the stated rule about the matter; that there had been managers' meetings in 1948 and 1949, and that Watkins had attended these meetings.

Watkins said that he did not attend any managers' meeting in 1948 because Dickey had sent him to Arkansas to pick up a Negro family who were to work on the plantation, and Dickey confirmed that statement. Watkins said that there was no managers' meeting in 1949, and that he knew nothing of that rule. Miss Sklar, an employee of Brown, testified that Brown sent out a letter to all of the managers in January, 1949, part of which stated: "We own all of the livestock on our plantations. We furnish each manager with a milk cow and maintain lots for raising meat for our own use. Managers are not permitted to keep any other than company owned livestock on our place—they are not permitted to sell or give meat

away.'' Watkins denied that he had received a copy of that letter. Crow, the 1949 plantation manager, testified that Brown was pretty upset over the incident of the meat, and Brown, in his testimony, indicated that.

Before Brown filed the criminal affidavit of February 23, 1950, he went to his attorney, R. D. Everitt of Ruleville, and discussed the matter with him. He said that prior to that he had investigated and ascertained that Watkins had killed ''my hogs'', and had put them in cold storage; that he then discussed the case ''very thoroughly'' with his attorney and asked him what he should do; that they talked of it about an hour, and his attorney advised him that he could ''replevy'' the meat and charge Watkins with embezzlement; that the attorney prepared the replevin affidavit and the embezzlement affidavit; that in all respects he acted on the advice of his attorney. Brown said that he did not tell his attorney that Dickey had hired Watkins for him because that was not the case. He said that no one on the plantation was supposed to kill any meat until he specified the date for the killing, and that Watkins also violated this rule. Crow admitted, however, that others on the plantation had killed meat in December. The attorney said that Brown had discussed the matter with him and stated: ''* * * he gave me one of those books of rules and regulations and he told me Mr. Watkins had killed four or five of his hogs, that Mr. Watkins was working for him and he had instructions what to do with the hogs and the meat but he had moved off the place and he told me Mr. Watkins had killed four or five of those hogs and placed them in cold storage at Drew in Mr. Watkins' name. He said he requested Mr. Watkins to return the meat and Mr. Watkins had told him he would return it and then he told me he wouldn't; that he had sent him word to return the meat and he wouldn't return the meat. He killed the meat in the early part of December and he told me at that time at the time the meat was killed he knew he wouldn't be with him another year and he asked me what he could do under those circumstances.

With the facts I have related to you, in short, I told him the meat belonged to him and he had a right to replevy it and if he appropriated it to his own use, to file an affidavit in Justice of the Peace Court charging him with embezzlement. * ☆ *''

The attorney said he prepared the criminal affidavit at Brown's request, and that he did not remember Brown telling him that Watkins had raised the meat for his own use as part of his compensation, and did not remember Brown telling him that Watkins was claiming the meat as his own. Brown did not tell him that Watkins claimed that he had killed the meat under Crow's instructions, although Brown did tell him that part of his contract was to furnish Watkins the meat. Brown did not tell him anything about a custom of outgoing employees to take their meat with them, contrary to the rule of the year books. The foregoing is a substantial summary of the testimony. The conflicting issues of fact are apparent.

The existence of two necessary elements of this tort are undisputed: that defendant instituted a criminal proceeding against plaintiff, and that it terminated in favor of accused. Prosser, Torts, p. 860. And the trial court was correct in submitting to the jury the other two issues of whether Brown acted without probable cause in instituting the criminal proceedings against Watkins, and whether he acted ''maliciously'', or with a primary purpose other than that of bringing an offender to justice. On the want of probable cause there was a question of fact of whether Dickey had the power to and did hire the appellant, of whether under such contract of hire part of Watkins' compensation was furnishing him with meat, of whether Watkins knew of and agreed to the yearbook rule that no meat was to be taken off of the place, of whether there was an agreement and custom for an outgoing manager to take his meat with him, of whether Watkins had attended meetings of the managers in 1948 and 1949, of whether Crow, the general manager, agreed for Watkins to kill the hogs on December 7, and

of whether Brown ▮▮ made a full and fair disclosure of the facts, which he either knew or should have known by reasonably diligent inquiry to exist, to his attorney, prior to instituting the criminal proceedings. The required full and fair disclosure to an attorney is a question of fact for the jury where there is a dispute on that issue. 34 Am. Jur., Malicious Prosecution, Sec. 71, 78, 163; 54 C. J. S., Malicious Prosecution, Secs. 45-53, 100; Whitfield v. Westbrook, 1866, 40 Miss. 311; Kehl v. Hope Oil-Mill & Compress Co., 1900, 77 Miss. 762, 27 So. 641; State Life Insurance Co. of Indianapolis v. Hardy, 1940, 189 Miss. 266, 279, 195 So. 708; 3 A. L. I., Restatement of Torts, Sec. 666. Whether this full and fair disclosure was made by Brown to his attorney, and Brown knew or should have known of the understanding of Watkins, and the correctness of Watkins' interpretation of his contract were all factual issues relevant on want of probable cause. Prosser, Torts (1941) pp. 879-880; Medlin v. Clarksdale Steam Laundry, 1924, 136 Miss. 390, 101 So. 557; Brown v. Kisner, 192 Miss. 746, 6 So. (2d) 611.

▮▮ Whether Brown acted with ''malice'' in bringing the action was also a question for the jury. On this record the factual issue was whether Brown's primary purpose in instituting the criminal proceeding was other than that of bringing an offender to justice, that is, whether he was using the prosecution as a means to collect a debt or to recover the hogs which he thought belonged to him. Prosser, Torts, pp. 880-883. Unlike probable cause, the question of malice is to be determined by the jury unless only one conclusion may reasonably be drawn from the evidence. The defendant's improper purpose usually is proved by circumstantial evidence. And lack of probable cause for the initiation of the criminal proceedings is evidence of an improper purpose. 3 A. L. I., Rest. of Torts, Sec. 669. The jury had the right to consider in this respect also Brown's reliance on the advice of counsel, and whether he made a full and

fair disclosure to his attorney. It was warranted in finding that Brown had attempted to misuse the criminal process of the courts for his own private advantage, for the purpose of recovering the hogs or being paid for them. Prosser, Torts, p. 881; Grenada Coca Cola Company v. Davis, 1934, 168 Miss. 826, 151 So. 743; O'Bryant v. Coleman, 169 Miss. 776, 152 So. 59, suggestion of error sustained, 1934, 169 Miss. 780, 154 So. 259; 3 A. L. I., Rest. of Torts, Sec. 668.

Appellants also assign as error certain instructions obtained by appellee, but we think that they were proper. The three complained of must be read along with the other instructions granted by the court. When considered together, we think that the jury was properly instructed on the applicable law. Essentially, the questions here were ones of fact for the jury. Nor do we think there was any error in submitting to the jury the issue of punitive damages.

Affirmed.

**Roberds, Lee, Hall,** and **Kyle, JJ.,** concur.