430 So.2d 843 (1983)
Michael OWENS
v.
The KROGER CO.
No. 53692.
Supreme Court of Mississippi.
April 20, 1983.
Thomas M. McNeely, Kenneth Steiner, Natchez, for appellant.
Adams, Forman, Truly, Ward, Smith & Bramlett, R. Kent Hudson, Everette Truly, Natchez, for appellee.
Before WALKER, P.J., and ROY NOBLE LEE and HAWKINS, JJ.
HAWKINS, Justice, for the Court:
Michael Owens appeals from a judgment of the Circuit Court of Adams County in favor of the defendant The Kroger Company notwithstanding a jury verdict in favor of Owens.
*844 The only question we address on this appeal is whether a jury issue was made on the necessary elements of probable cause and malice in the malicious prosecution suit by Owens. We find there was, and reverse and reinstate the jury verdict.
At 3:00 p.m. on May 15, 1979, Michael Owens got off work from his job with an oil company. He first went home, thence to cash his pay check, and then to the home of his cousin, Shelby Butler. They drove around in Owens' car, and eventually went to the Natchez Kroger store. Owens was 27 and single at the time, but had a girlfriend named Carolyn Green. Carolyn was the mother of Owens' son, Ken Green.

THE FECKLESS SHOPPER
Since the evidence presented by Owens and Kroger contains some material difference, we summarize the testimony of each side.

OWENS
According to Owens, he and Butler arrived at Kroger's between 7:30 and 8:00 p.m. They went into the store where Owens purchased milk and Pampers for Ken. They returned to the car, and could not crank it. Owens went back into the store to purchase some jumper cables if in stock.
While in the store for the second time, he recalled that Carolyn wanted some barbeque sauce and ribs. He also found some jumper cables. He brought them to the checkout counter, paid for them, and left them there. His reason for leaving these purchases at the counter was that he did not want to carry the bag around the store with him. He then walked to the produce department and saw some Irish potatoes. He did not know whether Carolyn wanted loose or sacked potatoes, so he picked up a plastic bag containing 5 pounds of Irish potatoes worth 99¢.
He returned to the same cashier and told her he was going to call his girlfriend to see if she wanted loose or sacked potatoes. The pay telephone was near the exit door, on its right as you leave the store.
The sack of potatoes was in plain view under his arm. His purchase remained on the counter as he walked toward the phone carrying the potatoes.
He heard the cashier tell the security guard, David Robinson, that he was leaving without paying for the potatoes. He had taken about two steps beyond the cash register when Robinson took him by the arm and told him he was under arrest. He was then taken upstairs where he and Robinson awaited arrival of Natchez policemen.

BUTLER
According to Butler, Owens and he arrived at Kroger's around 6:00 to 7:00 p.m. Butler went in the store with Owens the first time, although he was not making any purchases. Butler tired of waiting on Owens to complete his purchases and returned to the car where he played the radio. Butler went back into the store to ask Owens to come on out. Butler again returned to the car, turned the switch on and found the car would not crank. Butler went back into the store and told Owens the car would not crank, and Owens replied he would get some jumper cables.
Butler went outside to locate somebody who would jump them off. Owens still did not return to the car, and again Butler went into the store where he observed Robinson escorting Owens upstairs. A short while later, he saw Owens, Robinson, and two Natchez policemen come downstairs. They permitted Owens to pick up the items he had purchased. These items were located on a cashier's counter.

DEFENSE
Andra Rounds was a cashier at the checkout counter where Owens first made some purchases and left the store. Owens shortly returned and he came into the store "a couple of times," and she observed him walking out of the store with a bag of groceries, and a bag of potatoes that he had not paid for. The bag of groceries had been on a closed checkout counter, and Owens picked them up and was going out the door. *845 The security guard asked her if he had paid for the potatoes, and when she told him he had not, the guard approached Owens right at the door and arrested him. The time of the arrest was 10:00 p.m. or later.
According to Rounds, Owens did not come to her line or say anything to her before starting toward the door. Her checkout line was three lines from the closed line.
David Robinson was a full-time policeman with the Natchez Police Department. He worked part-time as security guard at the Kroger store.
He observed Owens come into the store around 9:00 p.m. According to Robinson, Owens "piddled around in the store for about an hour." Robinson recalled Owens having mechanical difficulties with his car, buying small items, coming in and out the store. Robinson testified he started watching Owens because "when people come to the store, they usually come in and shop and get whatever they're gonna get and go home." Robinson also noticed Butler in the store with Owens once or twice.
As to the reason for Owens' arrest, Robinson testified:
Mr. Owens had purchased some items and left them at a (sic) empty checkout counter at the end of it, and I was observing him at the time he left his bag; he went to the Produce Department and picked up a sack of potatoes, came back to the empty counter where no checkers were, picked up his bag that the items was (sic) in that he had purchased and proceeded towards the door. I then went to the checker who checked the items out that the bag that he had that he had paid for and asked her did he pay for the potatoes that he was carrying in his hand. She advised me that he did not; I stopped him at the door and placed him under arrest for shoplifting.
Robinson testified the potatoes were in plain view, and although he felt Owens was leaving the store, he could have been going to the telephone. When he arrested Owens he did not ask for any explanation, but simply placed him under arrest.[1] He testified the reason he did not wait until Owens got outside was that he might have to run him down, and he thought that if he was going to pay for them he would have paid for them at the checkout stand.
Robinson said the store procedure was that when a person passed the checkout counter with merchandise that was not paid for, he was considered a shoplifter. He conceded that merchandise was located beyond checkout counters, and it was possible to make a selection of certain merchandise between the checkout counter and the exit doors.
Robinson testified Owens had had a few drinks, although he was not drunk.

EVENTS FOLLOWING ARREST
The events following the arrest are not disputed. Owens was taken to the police station where he was required to make a $200 bond. He had $162.88 cash on his person. Butler, who arrived later at the police station, recalled that Owens also had some money in the glove compartment of his car. This money supplied the remainder of the bond. After Owens had been at the police station approximately two hours he was released on a $200 cash bond.
Prior to this incident Owens had never been arrested. His only offenses were a speeding ticket and an overtime parking ticket.
The next day he was tried in the City Court of Natchez for the crime of shoplifting 99¢ worth of potatoes, and was found not guilty.
Thereafter Owens filed suit against Kroger for slander, false imprisonment, and malicious prosecution. At the conclusion of Owens' case in chief, the circuit judge gave a peremptory instruction in favor of Kroger on the slander and false imprisonment claims but permitted the case to go to the jury on the issue of malicious prosecution.
*846 The jury returned a verdict in favor of Owens in the amount of $18,500, and the defendant made a motion for a judgment notwithstanding the verdict, which was sustained by the circuit judge. Owens appeals from the judgment dismissing his case.

LAW
The pertinent portions of Mississippi Code Annotated section 97-23-45 (1972) defining the crime of shoplifting are:
Any person who shall wilfully and unlawfully take possession of any goods, wares or merchandise owned or held by and offered or displayed for sale by any store or other mercantile establishment with the intention and purpose of converting such goods, wares or merchandise to his own use without paying the purchase price therefor shall be guilty of the crime of shoplifting... .
We dispose first of the contention of Kroger that under Mississippi Code Annotated section 97-23-51 (1972), it had a qualified privilege to institute this criminal charge. A careful reading of that statute, however, reveals that the protection afforded under the statute is the questioning of a suspect in a reasonable manner for the purpose of ascertaining whether or not he is guilty of shoplifting. It is the stopping, detaining momentarily, and questioning which enjoys the statutory privilege, not the subsequent institution of criminal proceedings. The circuit judge was therefore quite correct in dismissing the counts of slander and false imprisonment as to what transpired in the store.
The Second Restatement of the Law of Torts states that the rules imposed upon any recovery for wrongful prosecution of criminal proceedings represent an adjustment between two highly important social interests:
The first is the interest of society in the efficient enforcement of the criminal law, which requires that private persons who aid in the enforcement of the law should be given an effective protection against the prejudice that is likely to arise from the termination of the prosecution in favor of the accused. The second is the interest that the individual citizen has in being protected against unjustifiable and oppressive litigation of criminal charges, which not only involve pecuniary loss but also distress and loss of reputation.
Restatement (Second) of Torts introductory note at 405 (1977).
We have stated that in order to maintain a suit for malicious prosecution, the plaintiff must prove the following elements by a preponderance of the evidence: (1) the institution of a criminal proceeding; (2) by, or at the instance of, the defendant; (3) the termination of such proceedings in plaintiff's favor; (4) malice in instituting the proceedings; (5) want of probable cause for the proceeding; and (6) the suffering of injury or damage as a result of prosecution. See State, for the use and benefit of Foster v. Turner, 319 So.2d 233 (Miss. 1975); Harvill v. Tabor, 240 Miss. 750, 128 So.2d 863 (1961).
It is thus apparent that the only question on this appeal is whether or not a jury issue was made on both the elements of probable cause and malice.
In analyzing probable cause and malice, courts look to objective facts as to the former and the subjective state of mind as to the latter.
Probable cause is determined from the facts apparent to the observer when prosecution is initiated. When the facts are undisputed, it is the function of the court to determine whether or not probable cause existed. If the facts are in dispute, under our decisions it is a jury question, based upon proper instructions, to determine whether or not probable cause existed.[2]
*847 Malice, on the other hand, is a mental state. Its existence may be proved by circumstantial evidence, or the jury may infer malice from the facts of the case.
This Court examined the two concepts in Whitfield v. Westbrook, 40 Miss. 311 (1866). We stated:
"[I]t is universally agreed that the question of probable cause is a mixed question of law and of fact; that whether the circumstances alleged to constitute probable cause are sufficiently established, is a matter of fact for the jury; but whether, supposing them to be true, as alleged, they amount to probable cause, is a question of law, to be decided by the court... . . [I]t is error to refer the determination of the question of probable cause to the jury, under any state of case, without declaring to them the principles by which they must be governed in determining the question." [T]he duty of the court in instructing the jury on this point is clearly indicated.
Id. at 317, quoting Greenwade v. Mills, 31 Miss. 464, 467-68 (1856).
We also stated in Whitfield v. Westbrook that the absence of probable cause in the institution of a criminal proceeding was a circumstance from which the jury would be permitted, but not required to infer malice.
[T]he inference of malice, which may be drawn from the want of probable cause, is not an inference of law, or "prima facie evidence" by which the jury are bound at all events, but "the whole matter is free before them, unembarrassed by any considerations of policy, or convenience, and unlimited by any boundaries but those of truth; to be decided by themselves, according to the convictions of their own understanding."
* * * * * *
"[T]hese merely natural presumptions are derived wholly and directly from the circumstances of the particular case by means of the common experience of mankind, without the aid or control of any rules of law whatever." The jury may or may not, therefore, "infer malice" from the fact or circumstance of the want of probable cause. It is ... a "natural presumption," derived from the circumstances of the particular case by experience, without the aid or control of the law; for the consideration of the jury, and to be decided by them as they may deem consistent with truth and justice.
40 Miss. at 318-19 (emphasis in original).
In State Life Insurance Co. of Indianapolis v. Hardy, 189 Miss. 266, 195 So. 708 (1940), on the question of probable cause, this Court held:
In order to have probable cause for the institution of a criminal prosecution, the prosecutor must not only "reasonably believe that the person accused has acted or failed to act in a particular manner," but must also "correctly believe that such acts or omissions constitute at common law or under an existing statute the offense charged against the accused." ... "Hence, if the facts charged do not amount to a criminal offense, the party making the charge is not protected by proving the truth thereof," ... nor, by proving that he believed that the facts charged constituted a criminal offense.
Id. at 277-78, 195 So. at 713 (emphasis in original) (citations omitted).
In Brown v. Kisner, 192 Miss. 746, 6 So.2d 611 (1942), we further held, however, that if the belief in the guilt of the accused was predicated upon the advice of a competent attorney who had been given all the relevant facts, probable cause would be deemed to have existed. See also Brown v. Watkins, 213 Miss. 365, 56 So.2d 888 (1952); Restatement (Second) of Torts § 666 (1977).
In both State Life Insurance Co. of Indianapolis and Brown v. Kisner we likewise held that the term "malice" in the law of malicious prosecution was used in an artificial and legal sense, and applied to a prosecution instituted primarily for a purpose other than that of bringing an offender to justice.
In Brown v. Watkins, supra, we held upon disputed facts that the issue of probable cause was for the jury. We also held *848 that the existence of malice was a jury question. We stated:
Unlike probable cause, the question of malice is to be determined by the jury unless only one conclusion may reasonably be drawn from the evidence. The defendant's improper purpose usually is proved by circumstantial evidence. And lack of probable cause for the initiation of the criminal proceedings is evidence of an improper purpose.
213 Miss. at 373, 56 So.2d at 891 (citation omitted).
In this case the issue of probable cause was for the jury on whether Owens, after leaving his purchases at the checkout counter, told the cashier he was going to go to the telephone to call his girlfriend and see if she wanted loose or sacked potatoes, and had only taken about two steps when he was placed under arrest and thereafter prosecuted by Kroger for shoplifting. His purchased items were in open view and his possession of the 99¢ bag of potatoes was in open view.
If the jury found there was no probable cause for the prosecution, Owens likewise had the right for the jury to pass upon the question of malice. Whether Kroger only intended to bring a malefactor to justice or had some other purpose in instituting the criminal proceeding was a question peculiarly within the province of the jury to answer.
We suspect the suspicion the perspicacious trial judge entertained in granting the judgment notwithstanding the verdict. Upon the evidence, however, we are compelled to conclude these were jury questions.
We therefore reverse and reinstate the verdict of the jury.
REVERSED AND RENDERED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
NOTES
[1] He also testified, however, that when he first stopped Owens, Owens gave as his reason for having the potatoes that he was "playing with Andra."
[2] The Restatement recommends that the factual issues be determined by a special verdict of the jury upon interrogatories to them, from which the judge will determine whether or not probable cause existed as a matter of law. Restatement (Second) of Torts § 673 comment e (1977). This state has never used special verdicts of interrogatories, however, and there is no question before us of the propriety of any jury instruction.