DIAZ, J.,
for the Court:
¶ 1. This case originated as an action against the Mississippi Gaming Commission and two of its investigative agents pursuant to the Mississippi Tort Claims Act. Lindon Baker, the plaintiff, brought suit claiming damages for “false arrest, wrongful imprisonment, wrongful detention, malicious prosecution, and abuse of process.” Baker’s claim arose out of his arrest in connection with charges filed by the Commission’s investigators alleging Baker to have violated certain provisions of Mississippi’s gaming laws. The case was tried in a bench trial in the Circuit Court of Tishomingo County and the court awarded Baker damages in the amount of $45,000. The Commission and its agents have appealed that decision, raising two ’ issues: (1) whether the judgment of the circuit court was contrary to the exemptions provided under the Mississippi Tort Claims Act and (2) whether the judgment of the circuit court was contrary to established law and against the overwhelming weight of the evidence. We find that neither of these claims merit reversal; therefore, we affirm the judgment of the lower court and award statutory penalties and interest.
FACTS
¶ 2. An inactive veteran’s organization, nonetheless possessing a valid charter, and known as Amvets Post 350 (hereafter “Amvet 350”), was revived apparently for the primary purpose of becoming the sponsoring entity for a charitable bingo operation in Iuka. Since bingo is a game of chance, it is regulated by the Mississippi Gaming Commission. At the time Amvet 350 obtained its permit from the Commission to undertake a bingo operation, the Commission’s regulations required that the sponsoring organization name one of its members as the supervisor of the operation. The supervisor was intended to be a person who would become knowledgeable in the various regulations associated with the bingo operation and who would be accountable to the Commission for the operation’s compliance with the applicable legal requirements. At the time relevant to this case, the supervisor of the operation was envisioned to be a volunteer un-salaried member of the organization in keeping with the proposition that these operations were to be limited to legitimate efforts by public-spirited organizations to raise funds for charitable purposes.
¶ 3. Amvet 350, pursuant to the regulations, named W.C. Reynolds as supervisor of its bingo operation, and he was approved in that capacity by the Commission. However, shortly after the Amvet 350 bingo operation commenced, Commission investigators making an on-site visit discovered that Reynolds’s brother-in-law, Lindon Baker, was actually running the enterprise. Baker was, at that time, shown as one of the authorized supervisors of another bingo operation — the Vietnow bingo game in Tupelo. Baker, when called upon to explain the situation, reported that, shortly after the Commission had approved the Amvet 350 bingo operation, Reynolds had suffered health problems that prevented him from taking up his supervisory duties at the bingo hall and that Baker, acting solely for the purpose of helping out his brother-in-law, had *1132 agreed to temporarily, but unofficially, take over the management of the Amvet 350 operation.
¶ 4. Further investigation revealed, however, that the Amvet 350 bingo checking account, though showing Reynolds as the only authorized signatory, had apparently been opened by someone other than Reynolds and that the signature on the signature card was not that of Reynolds. Commission agents inspected a substantial number of checks issued from the Amvet 350 bingo account, all of which appeared to bear Reynolds’s signature; however, it was revealed that Reynolds had not actually signed any of the checks and that they had been signed, instead, by Baker and other workers in the bingo operation.
¶ 5. Bingo regulations also required that prize payouts in excess of $500 be disbursed by check rather than cash and that certain information regarding the recipient be retained. This regulation was apparently designed as a safeguard to make it difficult for bingo operators to “skim” large sums of money from an operation and divert that money to purposes other than legitimate expenses or charitable disbursements. In the course of their investigation of bingo records, the Commission’s investigators became suspicious regarding one particular payout record because of some indication that the recipient named in the document was a daughter of an individual having ties to the bingo operation. Further investigation suggested the daughter may not, in fact, have been in the bingo hall on the date indicated in the payout document.
¶ 6. In an attempt to investigate these and other matters, the agents of the Commission requested that Baker accompany them to the sheriffs office for further questioning. There is no indication that Baker was placed under arrest at that time or that his presence at the sheriffs office was wrongfully coerced. After arriving at the sheriffs office, however, the agents testified that they administered Miranda warnings to Baker before commencing the interrogation. The agents had also begun a process of setting up a video camera apparatus for the apparent purpose of recording Baker’s questioning. At that point, Baker balked and refused to voluntarily cooperate further with the Commission agents.
¶ 7. Agent Strachan thereupon was able to obtain the presence at the jail of a local justice court judge. Strachan proceeded to execute several criminal affidavits against Baker charging him with violations of the State’s gaming laws. On the strength of those affidavits, the justice court judge issued an arrest warrant for Baker and he was, at that point, taken into custody. By that time, it was after 9:00 p.m., and Baker was unable to arrange bail on the charges. As a result, he was forced to remain overnight in jail. In fact, a total of fifteen hours passed between his arrest and his ability to obtain his release under suitable bond.
¶ 8. No substantial effort was made by any prosecuting official to pursue these criminal charges instituted against Baker. After several postponements of the preliminary hearing on the charges in the Tish-omingo Justice Court, the prosecution caused an entry of nolle prosequi to be entered as to all charges.
¶ 9. After that action was taken, Baker commenced a civil proceeding in circuit court, seeking damages for the actions of the Commission agents in causing his arrest and incarceration. The trial court’s decision to render judgment in favor of Baker was based on a finding that a case of malicious prosecution had been made out by Baker. From that decision, the Commission and Agents Strachan and Crocker perfect this appeal.
DISCUSSION
I. WHETHER THE JUDGMENT OF THE CIRCUIT COURT WAS CONTRARY TO THE EXEMPTIONS PROVIDED UNDER THE MISSISSIPPI TORT CLAIMS ACT
*1133 ¶ 10. As stated in Jones v. State, 606 So.2d 1051, 1058 (Miss.1992), “A trial judge will not be found in error on a matter not presented to him for decision.” There is a general requirement that objections be raised at the trial level. Smith v. State, 572 So.2d 847, 848 (Miss.1990) (determining that court could not consider defendant’s assignment complaining of two instructions where there was nothing in record indicating that defendant objected to them at time of trial); Burney v. State, 515 So.2d 1154, 1156-57 (Miss.1987) (stating that defendant’s failure to make contemporaneous objections to alleged improper closing remarks by prosecution or to move for mistrial precluded appellate review).
¶ 11. In the case sub judice, the agents argue that they should be entitled to qualified immunity under the Mississippi Tort Claims Act, Mississippi Code Annotated Section 11-46-9. Although the agents asserted that they were protected by this provision in their answers and defenses pleadings, no further mention of the Tort Claims Act or qualified immunity exists in the record. The agents failed to make oral or written motions with regard to qualified immunity. The failure of the agents to give the circuit judge an opportunity to decide the issue at trial level precludes appellate review now. Since the appellants failed to raise the issue in the court below, they have waived the issue of qualified immunity for purposes of this appeal. Accordingly, this assignment of error is without merit.
II. WHETHER THE JUDGMENT OF THE CIRCUIT COURT WAS CONTRARY TO ESTABLISHED LAW AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE
¶ 12. The Mississippi Supreme Court has stated that a “trial judge’s finding is entitled to the same deference as a jury verdict and will not be reversed upon appeal unless manifestly wrong.” R.C. Construction Co., Inc. v. Nat’l Office Systems, Inc., 622 So.2d 1253, 1255 (Miss.1993). Additionally, “[a] circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor,” and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence. Par Industries, Inc. v. Target Container Co., 708 So.2d 44, 47 (Miss.1998)(quoting Puckett v. Stuckey, 633 So.2d 978, 982 (Miss.1993)). Therefore, this Court should follow the standard set forth in Bray v. City of Meridian, 723 So.2d 1200, 1202 (Miss.App.1998) and respect the factual findings of a circuit judge trying a cause without a jury when the findings are supported by reasonable evidence in the record and are not manifestly wrong.
¶ 13. Malicious prosecution involves “the misuse of criminal ... actions as a means of causing harm.” W. Page Keeton Et Al., ProsseR and Keeton on the Law of Torts § 119 (5th ed.1984). There are six distinct elements under Mississippi law necessary to prove a claim for malicious prosecution, each one of which must be proven by a preponderance of the evidence. Those elements, for purposes of our discussion, may be set out as follows:
(1) A commencement of a criminal or civil proceeding against the plaintiff
(2) By the defendant;
(3) A termination of the proceeding that is favorable to the plaintiff;
(4) An absence of probable cause to institute the proceeding;
(5) The proceeding was instituted maliciously; and
(6) Damages were suffered as a result of the proceeding.
Moon v. Condere Corp., 690 So.2d 1191, 1194 (Miss.1997).
¶ 14. Having determined that this case was decided under the theory of malicious prosecution, we must determine whether there is sufficient evidence in the record to conclude that Baker proved all of the ele *1134 ments of his case by the requisite standard of proof.
THE FIRST THREE ELEMENTS
¶ 15. Since no legitimate dispute exists that the first three issues were proven, we will not discuss them at any length. By signing the affidavits, Strachan certainly can be charged with commencing the action that led to Baker’s arrest. Royal Oil Co. v. Wells, 500 So.2d 439, 443 (Miss.1986). There is also sufficient evidence to conclude that Gary Crocker, by his participation in the events of that evening, was acting in concert with Strachan and could be considered an active participant in Baker’s arrest and incarceration. That resolves the first two elements in Baker’s favor.
¶ 16. There is authority that ending the prosecution through entry of a nolle ;prosequi is the kind of termination favorable to the plaintiff that would satisfy that element of the tort. Brooks v. Super Service, Inc., 183 Miss. 833, 183 So. 484, 484-85 (1938); Keeton et al., supra. That fact resolves the third element in Baker’s favor.
MALICE
¶ 17. Professor Prosser suggests that, in a malicious prosecution action, the element of malice can be established by showing that the person instituting the prosecution “acted chiefly to give vent to motives of ill will.... ” Keeton et al., supra § 11. In Mississippi, the element of malice in a malicious prosecution has been said to be the institution of a prosecution “primarily for a purpose other than that of bringing an offender to justice.” Benjamin v. Hooper Elec. Supply Co., 568 So.2d 1182, 1191 (Miss.1990).
¶ 18. Investigating agents of a regulatory body such as the Commission have, as one of their principal duties, the obligation to unearth evidence of criminal activity. Once such a discovery of suspected criminal activity is made by the investigating agent, the agent would likely be the only person capable of supplying probable cause for the warrant to issue. Generally, an investigating officer swears out the affidavit that is presented to the magistrate in order to obtain the arrest warrant.
¶ 19. In this case, it would have been preferable for these agents to have simply gathered evidence about improprieties in the Amvet 350 bingo operation and presented that information in due course to the Commission officials charged with making prosecutorial decisions. In that scenario, the charges could have been instituted against Baker, if pursued at all, in an orderly progression of events. Instead, these agents made a decision to have Baker immediately arrested — a decision that appears rather precipitous on its face and apparently was based in part on their indignation at Baker’s decision to cease cooperation. The arrest was accomplished without advance warning, late in the evening, at a time when Baker’s prospects for making bond and avoiding an overnight incarceration were doubtful. One of the agents testified that the decision to swear out the affidavits that led to Baker’s almost instant incarceration was only made after Baker refused to voluntarily continue answering their inquiries — a right that Baker certainly enjoyed under the constitution and one, therefore, for which he ought not to have suffered State-sponsored retribution. The behavior of the agents in this case is analogous to a trial judge who orders harsher sentences for defendants who assert their right to a jury trial instead of agreeing to a plea bargain. Gillum v. State, 468 So.2d 856, 864 (Miss.1985) (holding that trial court is prohibited from imposing heavier sentence upon defendant because he has exercised his constitutional right to trial by jury than sentence offered defendant in plea bargaining process).
¶ 20. It is not readily apparent what urgency necessitated Baker’s immediate incarceration, late in the evening, for a series of nonviolent offenses, all of which *1135 occurred days prior to the arrest. Thus, when viewing the facts dispassionately, it is difficult to escape the conclusion that these agents were, at the very least, proceeding with an unseemly measure of zeal, and for the purpose, at least in part, of retaliating against Baker for his decision to cease cooperating in their investigation of possible improprieties in the Amvet 350 bingo operation.
¶ 21. In view of the entire circumstances surrounding Baker’s sudden incarceration, following hard on the heels of his decision to cease cooperating with the Commission’s agents, this Court is unable to conclude that the trial court, sitting as finder of fact, was substantially in error in finding that there was an element of retribution in the decision to suddenly initiate a criminal action late in the evening for alleged offenses of which these agents had possessed knowledge for several days. This would appear to demonstrate the sort of ill will that could be said to constitute the necessary malice to establish Baker’s right of recovery. We, therefore, resolve the issue of malice on the part of the defendants in Baker’s favor.
PROBABLE CAUSE
¶ 22. In Owens v. Kroger Co., 430 So.2d 843, 846 (Miss.1983), the Mississippi Supreme Court held that the element of probable cause is a mixed question of law and fact. In order to have probable cause for the institution of a criminal prosecution, the State must reasonably believe that the accused has acted or failed to act in a particular manner, and the State must also correctly believe that the acts or omissions of the accused constitute a common law or statutory crime. State Life Insurance Co. v. Hardy, 189 Miss. 266, 195 So. 708, 712 (1940) (emphasis added).
¶ 23. In the instant case, the trial court stated that it was “of the opinion that the Defendants in this case acted in a wanton and malicious fashion with regard to the interrogation and subsequent imprisonment of the plaintiff, Lindon Baker, without sufficient probable cause, and that the criminal proceedings were ultimately terminated in favor of the plaintiff and that as a proximate result of these actions, the plaintiff has suffered damage and injury. ... ” The judge in this bench trial was in the best position to listen to the witnesses, observe their demeanor, consider all of the evidence presented, and reach the decision that Agents Strachan and Crocker maliciously instituted criminal proceedings against Baker. By the same token, it was the trial judge who was in the best position to determine whether Baker had presented sufficient evidence to raise a jury question of whether agents had probable cause to believe Baker had violated the State’s gaming laws.
¶ 24. In this case, the trial judge did not find that the agents reasonably believed that Baker persisted in signing W.C. Rey-nold’s name to checks instead of his own in order to conceal his unauthorized activities at Amvet 350. It is not our position, as an appellate court, to review and comment upon the thought processes and internal motives of the agents. Doing so incorrectly substitutes our judgment for that of the trial court. Moreover, the trial judge, who heard all of the testimony and considered all of the evidence as it was presented, found that these agents, at the time of Baker’s arrest, did not have probable cause to believe that Baker and Reynolds had conspired together.
¶ 25. Although doubts exist as to the reasonableness of the agent’s actions, it is more unlikely that the agents’s beliefs were correct and that Baker’s acts constituted common law or statutory crimes. At trial, Reynolds testified that he was listed as the statutory signatory on the bingo checking account for Amvet 350. Reynolds further testified that prior to the scheduled opening of the facility, he suffered from pneumonia and severe diabetic problems. Therefore, he gave Baker permission to sign his name to checks. Reynolds stated that he relayed this information *1136 to the agents before they swore out the affidavits and arrested Baker. If a person whose name was forged is the victim of the crime, evidence that the purported victim had actually extended permission to the forger would be a legitimate defense to a criminal prosecution. See Freeman v. State, 293 So.2d 469, 470 (Miss.1974).
¶ 26. Although it can be argued that this case extends beyond the normal principles of criminal forgery, a review of the gaming statutes found in Mississippi Code Annotated Sections 97-33-67(3) and 97-33-69(1) does not indicate that Baker exceeded the scope of Reynold’s or his authority.
¶ 27. Mississippi Code Annotated Section 97-33-67(3) states that:
Each licensee shall designate a supervisor and a sufficient number of alternate supervisors to be in charge of and primarily responsible for each session of a bingo game. Such individual shall be familiar with the provisions of Sections 97-33-51 through 97-33-203 and the rules and regulations of the commission. Such individual, or alternate who shall be designated as the bingo supervisor, shall supervise all activities of such session and be responsible for the conduct of all games of such session. The supervisor shall be present at all times on the premises during the session.
¶ 28. Mississippi Code Annotated Section 97-33-69(1) states:
Except as otherwise provided in subsection (3) of this section, no person shall hold, operate, conduct or assist in holding, operating or conducting, any bingo game under any license issued pursuant to Sections 97-33-51 through 97-33-81, except designated supervisors or alternate supervisors designated as provided for in Section 97-33-67(3).
A logical reading of these statutes suggests that they exist not to criminalize the actions of one in Baker’s position, i.e., designated by the statutory signatory to act on his behalf when necessary, but to prevent the operation of any aspect of the games by those not authorized to do so or those with an interest in the outcome of the games.
¶ 29. After reviewing the record of the proceedings below, we conclude that, as to both affidavits, Baker successfully presented competent evidence to create a question of whether the agents lacked probable cause to believe that he had violated the State’s gaming laws. Therefore, we resolve the issue of an existence of probable cause in favor of Baker.
DAMAGES
¶ 30. The Mississippi Supreme Court has held that “damages may be recovered for emotional anguish, suffering, and emotional distress where the wrongful act causing such condition was intentionally or willfully done or done with such grossness and recklessness as to evince utter indifference to consequences.” T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481, 485 (Miss.1972) (citation omitted). “Punitive damages are allowable in those cases where the alleged wrong done the plaintiff is such as to import insult, fraud, oppression or a reckless disregard for the rights of the plaintiff.” Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226 (1962). The amount of any such damages which are reasonably proven by the plaintiff at trial is within the sound discretion of the trier of fact. Blackwell, 261 So.2d at 485. Although the Commission and the defendants mention that the element of damages was not proven at trial, they cite no legal authority in support of this assignment of error. The supreme court and this Court have repeatedly stated that it is the appellant’s duty to provide authority in support of his claims of error. Drennan v. State, 695 So.2d 581, 585-86 (Miss.1997). Accordingly, the defendant’s failure to cite authority in for this issue preludes appellate review.
¶ 31. Nevertheless, the amount of damages awarded was within the discretion of the trier of fact. Since the record below indicates that Baker sufficiently *1137 proved his case of malicious prosecution against the Commission and the agents, the damage award of $45,000 was reasonable. Therefore, the issue raised by the agents that there was insufficient evidence to prove the claim of malicious prosecution is without merit. Accordingly, we affirm the trial court’s decision.
¶ 32. Since 1857, Mississippi has imposed a mandatory penalty on parties who unsuccessfully appeal to the Mississippi Supreme Court. Miss. Rev.Code. Ch. 63, Art. 12 (1857). Furthermore, by statute, appellants are required to be charged with 15% of the judgment if it is (1) a final judgment (2) of the type specified by the "statute is (3) affirmed unconditionally (4) by the Mississippi Supreme Court. M.C.A. § 11-3-23 (Rev.1991). The statute expresses a bona fide interest in providing a measure of compensation for the successful appellee who has endured the rigors of successful appellate litigation. Walters v. Inexco Oil. Co., 440 So.2d 268, 274-75 (Miss.1983).
¶ 33. Here, Agents Strachan and Crock-er asked Baker to accompany them to the Tishomingo County Sheriffs Office purportedly to talk for a few minutes about Amvets 350 Bingo. Then, the agents set up video equipment and advised Baker of his Miranda rights. At that point, Baker chose to remain silent and refused to give a voluntary statement without the presence of legal counsel. When Baker invoked his . constitutional right to remain silent, Strachan swore out two affidavits against Baker for violations of the charitable gaming statutes. These affidavits were used to obtain an arrest warrant for Baker which was immediately executed at an hour when bail could not be made. While the ostensible purpose of these affidavits was to hold Baker to account for a possible crime, the trial court’s finding of the lack of probable cause indicates a far more malevolent purpose, that purpose being to summarily punish Baker for the exercise of a constitutional right. Baker remained in jail overnight. The next day, Baker posted bail. Eventually a nolle pro-sequi was entered on the charges against Baker by the State. Thereafter, Baker filed a claim for malicious prosecution against the agents and was awarded $45,-000 in a bench trial.
¶ 34. In Baker’s case, the public policy supporting the statutory penalty is certainly justified. In a feeble attempt to justify their actions, the agents stated that Amvets 350 Bingo was “completely out of control.” However, upon review, it is our opinion that it was the malicious, vengeful behavior of Agents Strachan and Crocker that was unchecked and out of control. The statute is designed to discourage frivolous appeals and to provide compensation for the successful appellee. The statute directs the imposition of penalties based upon the judgment or decree affirmed if it is monetary. Therefore, we impose a statutory penalty of 15% upon the $45,000 award to Baker.
¶ 35. THE JUDGMENT OF THE TISHOMINGO COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL, PLUS STATUTORY PENALTIES AND INTEREST, ARE ASSESSED AGAINST THE APPELLANTS.
KING, P.J., AND BRIDGES, COLEMAN, IRVING, LEE, PAYNE, AND THOMAS, JJ„ CONCUR.
McMILLIN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY SOUTHWICK, P.J.