568 So.2d 1182 (1990)
Benny T. BENJAMIN, Jr.
v.
HOOPER ELECTRONIC SUPPLY CO., INC., d/b/a Hooper Sound and Kevin Ray Cash.
No. 07-CA-59250.
Supreme Court of Mississippi.
October 3, 1990.
*1185 Jimmy D. McGuire, McGuire & Cox, Gulfport, for appellant.
David L. Cobb, Bryan Nelson Allen Schroeder Cobb & Hood, Robert W. Atkinson, Bryan Nelson Firm, Gulfport, for appellees.
Before HAWKINS, P.J., and SULLIVAN and ANDERSON, JJ.
ANDERSON, Justice, for the Court:
This is an appeal from the Circuit Court of the First Judicial District of Harrison County wherein the trial judge granted the defendants' motion for a directed verdict at the close of the trial. The appellant, Benny T. Benjamin, Jr. (Benjamin) charged appellees, Hooper Sound and Kevin Cash (collectively Cash) with malicious prosecution and intentional infliction of emotional distress. Benjamin appeals maintaining that the trial court erred in directing a verdict in favor of Cash. We agree and reverse and remand for a new trial.

STATEMENT OF THE FACTS
On March 14, 1985, Benjamin went to Hudson's Salvage Center in Gulfport and purchased a Yamaha stereo amplifier for approximately $189.00. There were no installation instructions in the package so the following day Benjamin and his friend, John Burts, went to Hooper Sound in Gulfport to get installation instructions.
While Benjamin and Burts were in Hooper Sound, Kevin Cash, the manager, approached them and offered assistance. Benjamin informed Cash that he needed instructions, but Cash told him he could not give him any. Benjamin and Burts remained in the store looking at various items throughout the store. They noticed an amplifier identical to the one that Benjamin had purchased the day before priced at $350.00. Realizing that he had gotten a bargain, Benjamin told Burts, and they began laughing about the price. Cash overheard Benjamin say that he had not paid nearly that amount for his amplifier. At that moment Cash interjected, "Between you and I, it's got to be hot."[1] Benjamin responded that it must be one of those direct-from-the-factory deals. Cash did not say anything else, but he sent another salesman over to talk to Benjamin and Burt.
According to the testimony, Benjamin and Burt drove to Hooper Sound in Benjamin's yellow Volkswagen. Its tinted windows were closed; the interior is black; and consequently, it is virtually impossible to see into the car. In addition, one of the windows did not have a handle so it could not be lowered. Benjamin did not lock the doors, but he placed the box containing the amplifier behind the passenger seat on the back. Although the box was not completely concealed, it was not in plain view either.
After Cash summoned the salesman, he went outside with the intent of investigating Benjamin's amplifier. Nobody saw him go into Benjamin's car and Cash vehemently denies doing so.[2] According to his testimony, Cash was able to obtain the serial number of the amplifier by looking through the passenger window to see the serial number on the amplifier. This was so although the number was on a yellow tag no larger than 1 1/2 inches by one inch.
*1186 Cash wrote the tag number of the car, the serial number of the amplifier, a description of the car and a description of Benjamin. He then called the police and gave them the serial number of the amplifier and asked if it were stolen. Later that evening Benjamin was arrested and interrogated concerning the amplifier.[3] During the interrogation, Cash walked in and the interrogating officer, Glen Terrell, stopped questioning Benjamin and went to talk to Cash. Cash spent approximately an hour to an hour and a half talking to Terrell. During their conversation Cash gave a recorded statement to the officer. He gave the officer the serial number he had taken, and he informed Terrell of what Hooper Sound would charge for the amplifier. He also told the officer what amount Benjamin said he had paid for his amplifier. Cash, moreover, identified Benjamin from a photographic lineup.
A preliminary hearing was held sometime later, and Cash testified. Henry Wallace, the manager of Hudson's Salvage also appeared and testified on Benjamin's behalf. Wallace testified that Benjamin purchased the amplifier at Hudson's on the day before this entire episode. Following the hearing, Benjamin was bound over to the grand jury which returned an indictment for receiving stolen property. This indictment, however, was appropriately dismissed.[4]
Benjamin filed this lawsuit for malicious prosecution after the dismissal of the criminal prosecution. In support of this appeal, Benjamin specifically points to Cash's testimony on cross-examination as an adverse witness during the trial. He notes that Cash acknowledged that he could have asked Benjamin where he had bought the amplifier or could have asked him how he got such a good deal. Moreover, Benjamin emphasizes the fact that Cash took it upon himself to initiate the investigation  searching his car and relaying the results of that search to the police. Because of this information, along with Cash's subsequent identifications of Benjamin and his car, Benjamin was arrested and his car towed away and searched. His amplifier was confiscated, and he was interrogated and charged with receiving stolen property. As a result of this activity, Benjamin had to obtain counsel and post bond to be released from jail.[5] According to Benjamin's brief, but for Cash's actions at "every essential turn in prosecuting [him]," he would never have been arrested and charged with receiving stolen property.
In this appeal, Benjamin alleges the following error:

THE TRIAL COURT MANIFESTLY ERRED IN SUSTAINING THE DEFENDANT'S MOTION FOR DIRECTED VERDICT AT THE CLOSE OF THE DEFENDANT'S CASE AND SHOULD HAVE ALLOWED THE SUBJECT CASE TO BE SUBMITTED TO THE JURY FOR ITS CONSIDERATION
At the trial and after Benjamin had presented all of his evidence and rested his case, Cash moved for a directed verdict, which the Court took under advisement and at the same time instructed Cash to present *1187 his case. After doing so, and resting his case, defense counsel again moved for a directed verdict, at which time the motion was granted.

DISCUSSION OF THE LAW
When the defendant moves for a directed verdict at the close of the Plaintiff's case-in-chief, the circuit court must consider the evidence before it at that time in the light most favorable to the plaintiff, giving the plaintiff the benefit of all favorable inferences that reasonably may be drawn from that evidence. Hall v. Mississippi Chemical Express, Inc., 528 So.2d 796, 798 (Miss. 1988); see also Dale v. Bridges, 507 So.2d 375, 377 (Miss. 1987); Jones v. Hatchett, 504 So.2d 198, 205 (Miss. 1987); Collins v. Ringwald, 502 So.2d 677, 678-79 n. 1 (Miss. 1987); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975). Moreover, when this Court examines a trial court's decision regarding a motion for directed verdict, it must do so with great care. In addition, just as the trial court, this Court must consider the motion in light most favorable to the party opposing the motion. Guerdon Industries, Inc. v. Gentry, 531 So.2d 1202, 1205 (Miss. 1988); see also White v. Hancock Bank, 477 So.2d 265, 269 (Miss. 1985). The motion is granted only where the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men and women could not have arrived at a verdict for the non-movant. Guerdon, supra at 1205; accord Smith v. Wendy's of the South Inc., 503 So.2d 843, 844 (Ala. 1987) (If, by any interpretation, the evidence can support a conclusion in favor of the non-moving party, this Court must reverse) (citations omitted). These principles have been repeated in case after case. See, e.g. Rester v. Morrow, 491 So.2d 204, 211 (Miss. 1986) and Collins, 502 So.2d at 678 n. 1.
This Court, moreover, has recognized the constitutional concerns involved in allowing the jury to resolve factual issues brought out during trial. See City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983); see also Rester, supra at 211-12; Miss. Const. (1890) Art. 3, § 31. Not only has our Court emphasized the jury's role in a trial, but the United States Supreme Court noted the jury's importance as well:
Credibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 216 (1986) (emphasis added); see also Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Grice v. City of Dothan, 670 F. Supp. 318 (M.D.Ala. 1987).

MALICIOUS PROSECUTION
Before discussing the evidence involved in this case, it must be clear that "a citizen has a privilege to start the criminal law into action by complaints to the proper officials so long as one acts either in good faith, i.e, for a legitimate purpose, or with reasonable grounds to believe that the person proceeded against may be guilty of the offense charged." Harper, James and Gray, The Law of Torts § 4.1 at 406 (2d. ed 1986) (emphasis added) [hereinafter Harper & James]. The law allows a wide latitude for honest action on the part of the citizen who purports to assist public officials in their task of law enforcement. Id. at 407 (emphasis added) see also Prosser and Keeton on Torts, § 119 at 871 (5th ed. 1984) (the law encourages honest citizens to bring criminals to justice). Malicious prosecution is not the most favored tort because of a public policy in favor of halting and prosecuting crime.
There are two competing interests in all malicious prosecution cases. The public policy interest in crime prevention insists that private citizens, when aiding law enforcement personnel, ought to be protected against the prejudice that is likely to arise from the termination of the prosecution in favor of the accused. Owens *1188 v. Kroger, 430 So.2d 843, 846 (Miss. 1983); see also State, For the Use and Benefit of Foster v. Turner, 319 So.2d 233, 235 (Miss. 1975). "Large tort judgments against well-meaning individuals, acting honestly and in good faith, might seriously inhibit those attempting to perform what they believe a civic duty." Cates v. Eddy, 669 P.2d 912, 918-19 (Wyo. 1983) (emphasis added). Consequently, any policy that encourages these awards would also have the effect of discouraging community support in investigations.
Equally important is the second interest which protects individuals from being wrongly accused of criminal behavior which results in unjustifiable and oppressive litigation of criminal charges. Consequently, in our orderly society we allow those subjected to criminal proceedings cloaked with malice to recover compensation for their losses. Kroger, supra; see also 54 C.J.S. Malicious Prosecution § 4, pp. 524-25 (1987).
These two policy considerations are balanced by requiring two essential elements in establishing a case for malicious prosecution. Requiring both malice and lack of probable cause affords adequate protection for the first policy and a restriction upon the second. Cates, 669 P.2d at 918.

LAW
In order to show that the trial court erred in granting a directed verdict for malicious prosecution, there must have been some direct or circumstantial evidence from which the jury could reasonably infer each of the following elements:
(1) The institution [or continuation] of a criminal proceeding; (2) by, or at the insistence of, the defendant; (3) the termination of such proceedings in plaintiff's favor; (4) malice in instituting the proceedings; (5) want of probable cause for the proceeding; (6) the suffering of injury or damage as a result of the prosecution.
Parker v. Game and Fish Comm'n, 555 So.2d 725, 728 (Miss. 1989) (citations omitted); see also Edison v. Olin Corp., 527 So.2d 1283 (Ala. 1988).

INSTITUTION OF CRIMINAL PROCEEDINGS
Cash first asserts that the directed verdict was proper because Benjamin failed to put on evidence that Cash instituted the criminal proceeding.
In earlier Mississippi cases, whether the defendant initiated the proceeding has not been the close question. See, e.g., Royal Oil Co., Inc. v. Wells, 500 So.2d 439, 441 (Miss. 1986) (defendant initiated a criminal charge of embezzlement against plaintiff by executing and filing an affidavit charging plaintiffs with embezzlement); Kroger, 430 So.2d at 845 (store security guard told defendant he was under arrest, and defendant was taken upstairs where they awaited the arrival of the local police); and Torabi v. J.C. Penney, Inc., 438 So.2d 1354, 1355 (Miss. 1983) (plaintiff was taken away from store by security guards to the city jail where he was booked, photographed and fingerprinted).
In order to show that a defendant instigated a proceeding the evidence must support a conclusion that the "defendant must have been the proximate and efficient cause of maliciously putting the law in motion in the original proceedings." Winters v. Griffis, 233 Miss. 102, 108, 101 So.2d 346, 348 (1958) (quoting 54 C.J.S. Malicious Prosecution § 14, 966-68 (1948)). Moreover, in order to impose liability "there must be some affirmative action by way of advice, encouragement, pressure, etc., in the institution, or causing the institution of the prosecution, or in affirmatively encouraging its continuance after it has been instituted." Winters, 233 Miss. at 108, 101 So.2d at 348-49. It is not necessary that the defendant must be the one who files the direct charge because a defendant may be liable where he communicated the subject matter to the person who signed the complaint and such statement proximately caused the prosecution. *1189 See 54 C.J.S., Malicious Prosecution § 18 (1987); Harper and James, supra, § 4.3.[6]
Cash contends that he has instigated nothing. He points to this Court's discussion of the term in the related context of false imprisonment. For him to have instigated this criminal proceeding, Cash argues that he would have had to direct, request, invite or encourage Benjamin's prosecution. See Godines v. First Guaranty Savings and Loan Asso., 525 So.2d 1321, 1324 (Miss. 1988); see also Alabama Power Co. v. Neighbors, 402 So.2d 958 (Ala. 1981). Restatement (Second) of Torts, § 45(A). Moreover, "it is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them." Godines, 525 So.2d at 1324 (quoting Restatement 2d of Torts, § 45(A)); see also Larson v. Baer, 418 N.W.2d 282, 287 (N.D. 1988); Prosser & Keeton § 119 at 872.
Cash's argument concerning whether he, in fact, initiated or instigated the proceedings can be stated best another way. He simply contends that he was not the proximate cause of Benjamin's arrest. The whole idea of proximate cause in our law is to limit legal responsibility to causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Moreover, "the legal limitation on the scope of liability is associated with policy  with our more or less inadequate ideas of what justice demands, or of what is administratively possible and convenient." Prosser & Keeton, (5th ed. 1984) § 411, at 264. Consequently, this Court has insisted that a defendant's conduct is a cause of the event if it was a material element and a substantial factor in bringing it about. See New Orleans and N.E. RR Co. v. Burge, 191 Miss. 303, 311, 2 So.2d 825, 826 (1941) (emphasis added). Whether it was such a substantial factor is for the jury to determine unless the issue is so clear that reasonable persons could not differ. Prosser & Keeton, supra, at 267.
As the facts of this case indicate, Cash was a substantial factor in initiating these proceedings. There is no question that Cash went outside the store to begin his investigation. His acts were not passive or a result of acquiescence or negligence. In fact, they were intentional and deliberate. See Cates, 669 P.2d at 919. This point is emphasized further by the fact that there is conflicting evidence as to whether Cash trespassed to search Benjamin's car. Trespass is not the type of behavior that this Court should or would even want to encourage. Cash's extraordinary, and perhaps extra-legal pursuit of this matter, together with the evidence that Cash talked to Terrell in the midst of Benjamin's interrogation, and immediately following that conversation, the officer filed an affidavit against Benjamin, could lead a jury to question Cash's behavior.[7] Because we have to give all the inferences to Benjamin, there is a jury question whether Cash initiated the prosecution of the charges.

PROBABLE CAUSE
In addition to insisting that no instigation was proved, Cash maintains that Benjamin *1190 failed in proving the two remaining elements, malice and want of probable cause.
Unlike the previous element, in prior cases concerning this area of the law, appellants, particularly when attempting to set aside a jury verdict, have come to this Court assaulting plaintiff's proof of lack of probable cause and of malice. See Royal Oil Co., Inc. v. Wells, 500 So.2d 439, 443 (Miss. 1986); Owens v. Kroger Co., 430 So.2d 843, 846-48 (Miss. 1983); see also Miss. Road Supply Co, Inc. v. Zurich-American Ins. Co., 501 So.2d 412, 414 (Miss. 1987) (The case at issue turns primarily on the presence of probable cause).
Probable cause is determined from the facts apparent to the observer when the prosecution is initiated. Kroger, 430 So.2d at 846. In order to find probable cause there must be a concurrence of (1) an honest belief in the guilt of the person accused and (2) reasonable grounds for such belief. One is as essential as the other. Royal Oil, 500 So.2d at 443; see also Harvill v. Tabor, 240 Miss. 750, 755, 128 So.2d 863 (1961); Woolfolk v. Tucker, 485 So.2d 1039 (Miss. 1986). Unfounded suspicion and conjecture are not proper bases for finding probable cause. Miller v. East Baton Rouge Parish Sheriff's Dept., 511 So.2d 446, 453 (La. 1987); Prosser & Keeton, supra, at p. 876.
When the facts are undisputed, it is the function of the court to determine whether probable cause existed. Kroger, 430 So.2d at 846. On the other hand, when the facts are in dispute, this Court has proclaimed that it becomes a jury question and it is for them to determine based upon proper instructions. Id.; accord Wal-Mart Stores, Inc. v. Yarbrough, 284 Ark. 345, 681 S.W.2d 359, 361 (1984) (Unless both the facts and the reasonable inferences to be deduced from those facts are undisputed, this issue is to be submitted to the jury); Wainauskis v. Howard Johnson Co., 339 Pa.Super. 266, 488 A.2d 1117, 1122 (1985) (where material facts are in controversy it becomes a mixed question of law and fact; therefore, it is the jury's duty, under proper instructions from the court as to what will justify a criminal prosecution, to say whether the plaintiff in the civil action has shown want of probable cause upon the part of the defendant).
Want of probable cause may be proven by circumstantial evidence, but it is ordinarily necessary for the plaintiff to show circumstances from which the absence of probable cause may be inferred. Royal Oil, 500 So.2d at 444. If the evidence is such that the jury could have believed the prosecution was instituted without probable cause then that issue should go to the jury. Cf. Royal Oil, 500 So.2d at 444 (where jury could have believed there was no probable cause, a verdict in favor of the plaintiff could not be set aside).
In maintaining that there was probable cause, Cash says that because of his years of experience of dealing with Yamaha equipment, combined with his knowledge of the agreement between Yamaha and Hooper Sound, he knew that Benjamin could not have paid the price that he paid. Moreover, he believes that because Benjamin said he got it via a direct-from-the-factory deal, probable cause existed.
In response, just because Benjamin had a Yamaha amplifier in the city of Gulfport does not mean that he bought it in Gulfport. Hooper and Sound Advice may very well have been the only companies licensed to sell the equipment in Gulfport. But, it is just as likely that Benjamin could have gotten the amplifier in one of a dozen other cities in at least two other states. It is not inconceivable that Benjamin could have driven to Biloxi, Ocean Springs, Long Beach, Pascagoula, or Moss Point. He could have driven as far north as Hattiesburg. In any event, a drive to any of these places would not be incomprehensible just as a drive to Mobile or New Orleans is equally conceivable.
Cash simply could have asked Benjamin if he remembered the name of the store where he bought the amplifier. Or he could have at least given Benjamin an opportunity to explain where he bought it instead of surreptitiously going out to the parking lot and searching Benjamin's car. *1191 Cf. Harper and James, supra, § 4.5, n. 6 (where a reasonable person would investigate further before instigating a proceeding, the failure to do so is an absence of probable cause); see also Wainauskis, 488 A.2d at 1123 (probable cause must not be based upon an inadequate and unreasonable investigation of the circumstances concerning the alleged criminal conduct). Moreover, the fact that Cash did not give Benjamin an opportunity to explain gives the inference that Cash himself was not acting reasonably. Cf. Harris v. Lewis State Bank, 482 So.2d 1378, 1382 (Fla.App. 1 Dist. 1986) (where it would appear to a "cautious man" that further investigation is justified before instituting a proceeding liability may attach for failure to do so especially where the information is readily obtainable).
Taking all the evidence and giving the proper inferences that should be given, it is clear that the jury should have been given the opportunity to consider the evidence. They very well may have found that there was no probable cause.
Finally, Cash urges this Court to affirm the trial court because there was no malice.

MALICE
"Malice" in the law of malicious prosecution is used in an artificial and legal sense and applied to a prosecution instituted primarily for a purpose other than that of bringing an offender to justice. Royal Oil, 500 So.2d at 444; Kroger, 430 So.2d at 846. It may be proved by circumstantial evidence or the jury may infer malice from the facts of the case. Kroger, 430 So.2d at 847. Moreover, absence of probable cause for the prosecution is circumstantial evidence of malice. Royal Oil, 500 So.2d at 444. See also Fisher v. Beach, 671 S.W.2d 63, 67 (Tex. App. 5 Dist. 1984) (where a fact issue of probable cause exists, a fact issue as to malice necessarily exists). And, malice may be inferred from a finding that the defendant acted in reckless disregard of the other person's rights. Miller v. East Baton Rouge, 511 So.2d at 453 (citing Brown v. United States, 653 F.2d 196 (5th Cir.1981), cert. den. 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982)). Furthermore, this Court has emphasized that since the question of malice is a question of fact, it is to be determined by the jury unless only one conclusion may reasonably be drawn from the evidence. Kroger, 430 So.2d at 848 (quoting Brown v. Watkins, 213 Miss. 365, 373, 56 So.2d 888, 891 (1952)) (emphasis added).

CONCLUSION
Because this is an appeal from a directed verdict, one can not overemphasize the fact that all inferences should be given to Benjamin. These inferences make it possible for a juror to link several of Cash's actions to support malice. In fact, had Benjamin been allowed to make his closing argument, he may have tied together various things to demonstrate or infer malice. For instance, after overhearing the laughter between Benjamin and Burt, Cash interjected and said that the amplifier must have been hot. He subsequently sneaked off to search Benjamin's car. He was able to shield his disappearance and subsequent illegal act by sending a salesman to assist the customers. After Benjamin was taken to the police station, Cash came and encouraged Terrell to carry forward with the investigation.
Cash admitted that he could have asked Benjamin where he got such a good deal or he could have asked him to show him the amplifier. Instead, he took it upon himself to begin investigating. Because the investigation began so swiftly without any questions being asked and probable cause wanting an inference of malice is clear. This is more evident when there is a suggestion that Cash could have or might have considered Benjamin's race.
For example, on cross-examination, Cash said that although there were other cars in the parking lot, he went to the Volkswagen because "[he] noticed a FOXY 96 bumper sticker on the car ... their basic format tended to black audiences. Not to judge, but their format was black-oriented music, and that led [him] to his Volkswagen." Although he went through those inferences *1192 to get to Benjamin's car, Cash denied giving the police a description of Benjamin, but he gave the officers the serial number of the amplifier and a description of the vehicle and its tag number.[8]
For a person to go through all of those hoops to get to a person's car, it is not likely that any description would have remained incomplete. A reasonable juror could have made its own inferences, and one of those could have been that the investigation began because Cash did not understand or believe that a young black man legally could have bought that amplifier at that particular price. Moreover, he refused to believe that Benjamin could have traveled to any of the nearby cities along the coast or across the state line to buy this amplifier. Since he could not believe these things, he began his own investigation. Cf. Royal Oil, 500 So.2d at 444 ("other purpose" suggested here was that plaintiff was the target of defendant's anger because of her marriage to a black man).[9]
Cash initiated Benjamin's nightmare. We are convinced that Benjamin never thought that purchasing a Yamaha amplifier would be so expensive as to require jail time and the loss of his automobile. This was a senseless prosecution initiated by Cash in a reckless manner.[10] Whether Cash's involvement was shielded with probable cause and without malice should have been determined by the jury and we reverse and remand for a new trial.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BLASS, JJ., concur.
NOTES
[1] Cash testified that because of his experience with the company, he knew that only two companies in Gulfport, Hooper and Sound Advice, were authorized to sell Yamaha products. They executed agreements which prohibited them from advertising or selling the equipment at discounted prices. However, it was not "inconceivable" that the amplifier was purchased in another city (Biloxi, Pascagoula or Ocean Springs, etc.) or out of state (New Orleans or Mobile).
[2] It is, however, a strong indication that Cash, more likely than not, went into the car because his testimony was contradictory concerning where he found the box. Moreover, two witnesses, other than Benjamin, testified about the tint and dark interior of the Volkswagen, as well as the broken handle for the window. Additionally, some witnesses testified that Cash could not have seen the serial number without opening the car door. And, finally, before dismissing the case, the judge said that he believed that Cash searched the car.
[3] The record is somewhat muddled concerning the chronology of the events, but it reflects that as a result of a continuing police investigation, Officer Glen Terrell determined that the amplifier had been stolen in Salt Lake City, Utah. We do know that Cash went to the police headquarters and provided more information during Benjamin's interrogation. The police used the information that Cash had given them and located Benjamin's car. Terrell obtained a search warrant to search the car. As a result of the search, the police recovered a Yamaha amplifier with the same serial number that Cash had reported. From this investigation, Terrell charged Benjamin with receiving stolen property and signed an affidavit for an arrest warrant.
[4] The indictment was dismissed because it was defective as it did not state the name of the owner of the property. At the conclusion of the trial in the case sub judice, the trial judge expressed his distress concerning the conduct of the police and the later obtained indictment.
[5] Benjamin provided an elaborate discussion of his damages which included, inter alia, damage done to his car when it was towed and the eventual selling of its parts to pay his bondsman. See, Vol. II, T. 38-44.
[6] At this point we must emphasize that liability is not limited to instigating criminal proceedings, but continuing to prosecute such proceedings maliciously after learning their groundless nature will result in liability, although they were begun in good faith and with probable cause. See Harper and James at 416, n. 13 and (Supp. 1990). Without doubt, it is as much a wrong against the victim and as socially or morally unjustifiable to take an active part in a prosecution after knowledge that there is no factual foundation for it, as to instigate such proceedings in the first place. Id.
[7] Credibility was also a concern because there were some conflicts in Officer Terrell's and Cash's testimonies regarding at what point they had a discussion concerning this matter. There was another discrepancy which concerned whether Cash was called down to the police station for more information or if he came on his own. Finally, Terrell indicated that Cash informed the police about a "[s]uspicious person [and] suspicious activities."
[8] In a portion of his testimony he admits giving the officer a description of Benjamin. See, (T. 98). In later testimony the following occurred:

[Benjamin]: You are the one that called the police with regard to Benny; correct?
[Cash] In regard to the serial number; correct. I did not know Benny.
[Benjamin]: Well, You didn't tell them that it was some tall, white, skinny guy.
[Cash]: I didn't tell them it was a short, stocky, black guy, either. I gave them the serial number and tag number of the vehicle.
[Benjamin]: You provided a description of Benny.
[Cash]: I described the vehicle.
This obviously raises credibility concerns which should have gone to the jury.
[9] Clearly, the jury should have been given the opportunity to determine if probable cause existed. Inferences are important, and Benjamin could have developed an argument to demonstrate that this entire episode was based on Cash's unjustified suspicions.
[10] Needless to say, we must agree with the trial judge in admonishing the state for bringing this case before the grand jury without a careful investigation. Clearly, whatever harm Benjamin may have suffered was exacerbated by the prosecution's conduct. On retrial, however, it is Benjamin's responsibility to prove damages.