# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00682-COA

**BILLY MAGYAR**                                                                          **APPELLANT**

**v.**

**EMILY SHIERS AND JAMES SHIERS, JR.**                              **APPELLEES**

DATE OF JUDGMENT:                    05/03/2023
TRIAL JUDGE:                               HON. JANNIE M. LEWIS-BLACKMON
COURT FROM WHICH APPEALED:    YAZOO COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:         JEFFREY BIRL RIMES
                                                    JOHN GORDON (TRAE) SIMS III
ATTORNEY FOR APPELLEES:           JAMES LEE KELLY
NATURE OF THE CASE:                  CIVIL - TORTS-OTHER THAN PERSONAL
                                                    INJURY & PROPERTY DAMAGE
DISPOSITION:                              AFFIRMED - 05/13/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., LAWRENCE AND EMFINGER, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Billy Magyar filed charging affidavits in the Yazoo County Justice Court accusing Emily and James Shiers of the crime of malicious mischief. Magyar alleged that the Shierses were intentionally damaging his property by allowing sewage from a leaking septic system on Emily's property to run onto Magyar's property and across his driveway. Emily and James were arrested, but at trial, the justice court dismissed the charges for lack of evidence. The Shierses then sued Magyar in circuit court for malicious prosecution and other torts. After a bench trial, the circuit judge found Magyar liable for malicious prosecution and ordered him to pay the Shierses compensatory damages of $81,188 and punitive damages of $20,000. On appeal, Magyar argues that the circuit judge erred by (1) finding him liable for

malicious prosecution, (2) adopting the Shierses' version of events instead of his testimony, and (3) awarding punitive damages. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. In 1998, Emily purchased 2.79 acres of undeveloped land in Yazoo County on Ingram Loop, a short county road that connects Old Benton Road and Ingram Road. Around 2011, Magyar purchased an adjacent property and built a home on it. In 2013 or 2014, Magyar began trying to buy Emily's property from her. Emily told him she was not interested, but Magyar "was very insistent" and continued to call her about the property. Finally, Emily decided to "throw a crazy price out there," thinking that would get Magyar to leave her alone. Emily offered to sell the property to Magyar for $30,000. To her surprise, Magyar agreed. However, Magyar later dropped his offer to $5,000 because "[t]he bank wouldn't give [him] the loan for $30,000." Emily declined the reduced offer.

¶3. In the spring or early summer of 2015, Emily put a mobile home on her property to rent and hooked it up to the property's existing septic system. She and James formed a limited liability company to conduct the rental business, with James listed as a manager.

¶4. On September 5, 2015, Magyar noticed water running across the very end of his dirt/gravel driveway. The Magyar's home is set well back from the road, at least a "few hundred yards" from the location of the water at the end of the driveway. Magyar asked Frank Harrison, a local water association employee, if he could determine the source of the water. The next day, after speaking with Harrison, Magyar concluded that the water was sewage leaking from the septic system on Emily's property. Magyar testified that he asked

2

Harrison to advise the Shiers about the problem. In October 2015, tenants moved into the mobile home on Emily's property.

¶5.    Emily was pregnant at the time and gave birth prematurely to twin boys in mid-October 2015. Harrison called Emily while she was still in the hospital to tell her about the sewage leak on her property. James promptly called Fred Saxton, a septic system repairman, to address the issue. Emily and James testified this was the first time they were notified about the issue. Around the same time, the State Health Department was also notified of the water running onto Magyar's driveway and began working to identify the issue. However, due to heavy rains in the area, neither Saxton nor the Health Department could immediately determine the source of the water or whether it was sewage.

¶6.    Due to complications from childbirth and a subsequent emergency gallbladder surgery, Emily was not finally released from the hospital until November. In the interim, Magyar apparently grew increasingly frustrated about the water running onto his property. On November 13, Magyar went to the sheriff's department to complain. Magyar testified that Yazoo County Sheriff Jacob Sheriff told him, "[T]hat's not right. That's illegal. . . . Go down to justice court and sign a warrant and my guys will pick them up." Magyar then went to justice court and swore out two affidavits, charging Emily and James with willfully and maliciously destroying his property. Arrest warrants were issued for the Shierses.[1]

¶7.    Around November 15, Emily returned home from the hospital and found a notice in

_____

[1] Although the record is not entirely clear, it appears that Magyar's original affidavit against Emily may have been misplaced and that he signed an identical replacement affidavit months later. A different justice court judge then issued a warrant for Emily's arrest.

her mailbox that a certified letter was waiting for her at the post office. The letter was a notice from the Health Department that wastewater was being discharged onto Emily's property in violation of state law. Emily called the Health Department that day but could "not get in touch with anybody." The next day, the Health Department advised Emily to fill out an application to allow them to inspect her property. Emily promptly went to the local Health Department office, completed the application, and paid an associated fee.

¶8. On November 19, James was arrested on the outstanding justice court warrant. James was an officer with the Yazoo City Police Department, and he was on duty in full uniform when he was arrested. James had just delivered four arrestees to the county jail and was walking back through the sheriff's department "when the sheriff himself" stopped him and asked him "to step in [the sheriff's] office." The sheriff then told James he "was under arrest for malicious mischief." James "laughed" because he "thought [the sheriff] was joking," but it was no joke. A deputy took James's firearm, placed him under arrest, and took him back to the county jail. James was booked and placed in a cell with the same four arrestees he had brought to the jail only minutes earlier. He was released on his own recognizance later the same day. By the time James retrieved his phone, he had already received "several" Facebook notifications about his mugshot being shared on Facebook. James's mugshot was eventually shared on Facebook at least eighty-five times and had at least seventy-nine comments. James was suspended without pay for two weeks due to his arrest.

¶9. After James was released from jail, he went to Emily's property on Ingram Loop and took a video of the area near the end of Magyar's driveway, which was entered into evidence

4

at trial. The video shows some water near the end of Magyar's driveway and on the roadway, although the source of the water is not obvious from the video. As James noted in the video, there is no obvious damage to Magyar's driveway. The water is outside the gate to Magyar's driveway, within a few feet of the road and a few hundred yards from Magyar's home.

¶10. The Shierses continued working with Saxton and the Health Department to address the issue on their property. The Health Department's inspection was initially delayed due to heavy rains, but the Health Department eventually ordered the Shierses to install a new septic system. Saxton pumped out the old tank and installed a new septic system in December 2015, as soon as the Health Department had approved his plans.

¶11. Although the leak had been resolved, Magyar took no steps to try to bring an end to the Shierses' criminal prosecution. In June 2016, Emily was arrested on the justice court warrant. Emily is a professional mental health counselor and regularly counsels mentally ill inmates at local jails and prisons. She testified that her booking process was especially stressful because some of her clients witnessed her being booked at the jail. It quickly "became common knowledge" that she "had been arrested and booked," and her clients "wanted to know what [she] had done" and why she had been arrested.

¶12. Emily's and James's justice court cases were tried in June 2016. The judge dismissed the charges against both of them with prejudice, finding that "there were no facts or events that were proven or could be proven as to the intentional nature element" of the crime of malicious mischief.[2]

---

[2] "Every person who shall maliciously or mischievously destroy, disfigure, or injure, or cause to be destroyed, disfigured, or injured, any property of another, either real or

¶13. In 2017, Emily and James filed suit against Magyar in the circuit court for malicious prosecution and other torts. The case proceeded to a bench trial in December 2022.

¶14. At trial, James testified that his lost wages due to his two-week suspension totaled at least $1,300. In addition, he lost opportunities to work overtime and to work as a security guard for private businesses, but he could not "put a precise number" on those losses. He testified that his arrest, suspension, and negative public attention were especially stressful because Emily had just been released from the hospital following premature childbirth and surgery, and their newborn twins were still very small. He was suspended just before Christmas and was worried about his ability to provide for his family. James described the entire ordeal as a "nightmare." The Shierses also had to hire a lawyer to defend them against the criminal charges and to seek James's reinstatement as a police officer. They paid their first lawyer approximately $3,250. In addition, they incurred approximately $21,500 in attorney's fees and court costs in the instant civil suit.

¶15. Saxton, who had owned a septic tank service for about twenty-three years, testified that the Shierses called him from the hospital about repairing their septic tank. Saxton testified that he was going to work on the tank immediately, "but it was raining so hard" at the time that it took him "three or four days" to "get it done." Saxton testified that around the same time, the Health Department also contacted him about the issue. He testified that when the Health Department gets involved, he has to "wait on them to come out to do [a] soil

personal, shall be guilty of malicious mischief." Miss. Code Ann. § 97-17-67 (Rev. 2020). A conviction for malicious mischief requires proof that the defendant *willfully* (i.e., *intentionally*) destroyed the property of another. *Funderburk v. State*, 75 Miss. 20, 22, 21 So. 658, 659 (1897).

evaluation." Saxton testified that he was delayed by waiting for the Health Department to inspect the soil and then approve his plans to replace the tank. Saxton was finally able to install a new tank in December 2015.

¶16. The Shierses called Magyar as an adverse witness. He testified that around September 5, 2015, he noticed water running across the "end of [his] driveway." There was also a foul odor, and Magyar later determined that the water was sewage. He testified that it would cost $500 to remediate the damage done to his property. Magyar called Harrison, who worked for the local water association. Magyar testified that he asked Harrison to talk to the Shierses, and Harrison "did that" "[w]ithin a couple of days."[3]

¶17. Magyar testified that when weeks passed and the problem had not been addressed, he decided to talk to the sheriff about the problem. As noted above, Magyar testified that the sheriff told him that was "not right" and "illegal" and encouraged Magyar to "go down to justice court and sign a warrant and my guys will pick them up." According to Magyar, he then went to justice court, and a justice court judge "[p]ulled up [the] malicious mischief" statute and asked Magyar if the statute's language described his complaint. Magyar testified that the judge then "told the lady sitting in his office to write up" affidavits for Magyar to sign.[4] Magyar testified that his purpose in filing charges against the Shierses was to get the damage to his property "remediated or fixed."

---

[3] The circuit judge sustained a hearsay objection to Magyar's testimony about what Harrison allegedly told him or told the Shierses. Neither party called Harrison to testify.

[4] This justice court judge later recused himself from the Shierses' cases. Magyar's mother-in-law was the other justice court judge in Yazoo County, so a special judge was appointed to hear the Shierses' cases.

¶18. Magyar admitted that prior to filing charges against the Shierses, he never tried to talk to either Emily or James about the problem. He claimed that he was "afraid" to try to talk to either of them because his wife had showed him something on the "internet" about a prior assault James committed.[5]

¶19. Yazoo County Sheriff Jacob Sheriff also testified at trial. Sheriff testified that he "did not" encourage Magyar to swear out affidavits for malicious mischief or have James and Emily arrested. On cross-examination, Sheriff stated that he did not recall talking to Magyar.

¶20. Ken Evans, who works for the On-Site Wastewater Division of the Department of Health, testified that he became aware of the issue at the subject property in October 2015. He testified that when he first went out to investigate the issue, he was unable to determine whether the water was rainwater or sewage because the ground was saturated from weeks of heavy rains in the area. On November 22, 2015, Evans sent the Shierses a letter notifying them of a possible regulatory violation on their property and requesting their permission "to enter the property to conduct a more thorough investigation." Evans said it "took [him] several visits" to confirm that the discharge was wastewater, and he was then able to verify that the issue was "a failure of the existing septic system." Once Evans confirmed that the water was wastewater and not just rain, he sent the Shierses an official notice of violation on December 1, 2015. Evans did not know the exact date the Shierses received either notice. Evans testified that "[r]elative to every other case with a complaint," the Shierses were "very

_____

[5] The prior assault is addressed in Part II, *infra*. We note that the prior assault and related publicity occurred two or three years before Magyar repeatedly and persistently contacted Emily in an effort to buy the subject property.

8

willing to fix" the problem and were "very prompt" in doing so.

¶21.    Emily testified that she placed a mobile home on her property on Ingram Loop in 2015 and began renting it to tenants in October 2015.  Emily was admitted to the hospital in labor in mid-October.  Harrison contacted Emily and James about an issue on the property the next day—the same day their twins were born prematurely.  This was the first notice the Shierses had received about an issue on the property.  Due to complications from childbirth, Emily was not released from the hospital until November 5.  The next day, Emily realized something was "very, very wrong" and returned to the hospital.  Doctors discovered that her gallbladder had ruptured and performed emergency surgery to remove it.  Several days later, Emily returned home and found a notice that there was a certified letter waiting for her at the post office.  The letter was a request from the Department of Health for permission to inspect her property.  Emily promptly contacted the Department of Health and completed the necessary paperwork to allow the Department to inspect the property.

¶22.    James was arrested just two or three days later on November 19.  Emily was at home with her twins when James called to tell her he had been arrested.  As discussed above, Emily was arrested in June 2016.  She was required by law to report her arrest and the charges against her to national and state licensure boards and the State Department of Mental Health.  She described the stress of being booked in front of inmates she had counseled.

¶23.    Following trial, the circuit judge found Magyar liable for malicious prosecution.  The judge entered an opinion and final judgment that (1) awarded the Shierses damages of $24,068 in for legal fees and costs; (2) awarded Emily $35 for a jail processing fee she

incurred and $30,000 for emotional distress; (3) awarded James $35 for a jail processing fee, $750 for additional legal fees, $1,300 for lost wages, and $25,000 for emotional distress; and (4) awarded Emily and James punitive damages of $10,000 each ($20,000 total). Thus, the total judgment against Magyar and in favor of the Shierses was for $101,188. Magyar filed a motion to alter or amend the judgment, which was denied, and a notice of appeal.

## STANDARD OF REVIEW

¶24. "A circuit court judge sitting without a jury is afforded the same deference as a chancellor. We will not disturb a circuit court's findings after a bench trial unless they are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *City of Jackson v. Sandifer*, 107 So. 3d 978, 983 (¶16) (Miss. 2013) (footnote and quotation marks omitted). "The circuit court's findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *City of Jackson v. Lewis*, 153 So. 3d 689, 693 (¶4) (Miss. 2014) (quotation marks omitted). "Moreover, the circuit court, in its role as the finder of fact, has the sole authority for assessing witness credibility." *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (¶20) (Miss. 2023) (quotation marks omitted).

## ANALYSIS

### I. Malicious Prosecution

¶25. Magyar first argues that the circuit judge erred by finding him liable for malicious prosecution—particularly by finding a want of probable cause for the charges against Emily and James and by finding malice.

¶26. We recognize that malicious prosecution suits "must be managed with great caution."

10

*Croft v. Grand Casino Tunica Inc.*, 910 So. 2d 66, 72 (¶15) (Miss. Ct. App. 2005). Our

Supreme Court has stated:

> There are two competing interests in all malicious prosecution cases. The public policy interest in crime prevention insists that private citizens, when aiding law enforcement personnel, ought to be protected against the prejudice that is likely to arise from the termination of the prosecution in favor of the accused. . . .
>
> *Equally important* is the second interest which protects individuals from being wrongly accused of criminal behavior *which results in unjustifiable and oppressive litigation of criminal charges*. Consequently, in our orderly society we allow *those subjected to criminal proceedings cloaked with malice* to recover compensation for their losses.

*Wilbourn v. Wilbourn*, 314 So. 3d 104, 107 (¶15) (Miss. 2021) (quoting *Benjamin v. Hooper*

*Elec. Supply Co.*, 568 So. 2d 1182, 1187-88 (Miss. 1990)). We balance these competing

interests "by requiring two essential elements" in a malicious prosecution case: "malice and

lack of probable cause." *Benjamin*, 568 So. 2d at 1188.

¶27. "The elements of the tort of malicious prosecution are: (1) the institution of a

proceeding; (2) by, or at the insistence of the defendant; (3) the termination of such

proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) want of

probable cause for the proceeding and (6) the suffering of injury or damage as a result of the

prosecution." *Croft*, 910 So. 2d at 72 (¶14). "All six of these elements must be proven by

a preponderance of the evidence." *Id*. On appeal, Magyar contests the sufficiency of the

evidence of malice and want of probable cause.

### A. Malice

¶28. "Malice in the law of malicious prosecution does not refer to mean or evil intent but

11

rather connotes a prosecution instituted primarily for a purpose other than that of bringing an offender to justice." *Id.* at 73 (¶18). "As such, it refers to the defendant's objective, not his attitude." *Strong v. Nicholson*, 580 So. 2d 1288, 1293 (Miss. 1991). "Malice may be and usually is shown by circumstantial evidence. The [fact-finder] may infer malice from the facts of the case." *Id.* "[M]alice may be inferred from a finding that the defendant acted in reckless disregard of the other person's rights." *Benjamin*, 568 So. 2d at 1191. "Moreover, [the] absence of probable cause for the prosecution is circumstantial evidence of malice." *Id.* "Furthermore, [our Supreme] Court has emphasized that since the question of malice is a question of fact, it is to be *determined by the* [*fact-finder*] unless only one conclusion may reasonably be drawn from the evidence." *Id.*

¶29. Here, as discussed above, the Shierses presented substantial evidence that despite Emily's own health issues and the birth of their twins, they took immediate steps to address the issue on their property once it was brought to their attention. Indeed, Kenneth Evans from the Department of Health testified that "[r]elative to every other case with a complaint," the Shierses were "very prompt" in responding to the issue. Evans testified that the Shierses "didn't give [him] any trouble at all" and were "willing to fix [the problem] and went ahead and had it done." Substantial evidence supports the circuit judge's finding that there was no evidence that "Emily or James Shiers did anything maliciously or mischievously to Billy Magyar or his property."

¶30. In contrast, although Magyar obviously knew how to get in touch with the Shierses, he admittedly never took the simple step of contacting either of them directly about the

12

problem on their property. Magyar testified that the sheriff encouraged him to go to justice court and have the Shierses arrested; however, the sheriff himself denied that he gave such advice. Magyar then signed affidavits in which he alleged under oath that Emily and James had "willfully and unlawfully and maliciously or mischievously" destroyed or injured his property. However, the testimony at trial showed that Magyar had no way to know whether Emily or James had done anything to *willfully* destroy or injure his property. At trial, Magyar stated that "in [his] current frame of mind," he agreed that it was not appropriate to have someone arrested "due to a[n] accident."

¶31. Moreover, Magyar testified that his purpose in filing criminal charges against Emily and James was not "bringing an offender to justice" per se, *Croft*, 910 So. 2d at 73 (¶18), but rather to get the alleged damage to his property "remediated or fixed." In *Strong*, the Supreme Court held that the jury was warranted in finding malice because the defendants claimed that they were only trying to "get their stuff back" or "protect their property rights" rather than having a primary "purpose . . . of bringing grand larceners to justice." *Strong*, 580 So. 2d at 1293-94. In addition, in *George v. W.W.D. Automobiles Inc.*, 937 So. 2d 958 (Miss. Ct. App. 2006), this Court held that there was sufficient evidence of malice to survive summary judgment because the defendant's general manager testified that his purpose in signing a charging affidavit was "[t]o get the [defendant's] car back" rather than to have the plaintiff prosecuted for unauthorized use of a vehicle. *Id.* at 962 (¶¶12-13).

¶32. As stated above, "[m]alice may be and usually is shown by circumstantial evidence." *Strong*, 580 So. 2d at 1293. The evidence here is sufficient to support a finding that Magyar

13

"acted in reckless disregard of the [Shierses'] rights" by recklessly charging them with a crime. *Benjamin*, 568 So. 2d at 1191. This finding is sufficient to support an inference of malice for purposes of malicious prosecution. *Id.* "Moreover, absence of probable cause for the prosecution is circumstantial evidence of malice." *Id.* As we explain below, substantial evidence also supports the circuit judge's finding of a want of probable cause. Again, the issue of malice is a question of fact for the fact-finder "unless only one conclusion may reasonably be drawn from the evidence." *Id.* Here, substantial evidence supports the circuit judge's finding of malice. Accordingly, that finding of fact must be affirmed.

### B. Want of Probable Cause

¶33. "Probable cause is determined from the facts apparent to the observer when the prosecution is initiated." *Id.* at 1190. In this context, probable cause requires "a concurrence of (1) an honest belief in the guilt of the person accused and (2) reasonable grounds for such belief. One is as essential as the other." *Id.* In contrast, "[u]nfounded suspicion and conjecture are not proper bases for finding probable cause." *Id.* When the facts are in dispute, the existence or absence of probable cause is a question for the fact-finder. As with the element of malice, the fact-finder may infer an absence of probable cause from circumstantial evidence. *Id.*

¶34. Here, substantial evidence supports the trial judge's finding of a want of probable cause. As discussed above, Magyar initiated criminal proceedings against the Shierses, alleging under oath that they were intentionally discharging sewage onto his property. However, Magyar admittedly had no actual knowledge that the Shierses had done anything

14

intentionally to harm his property. Moreover, before filing criminal charges, Magyar never took the simple step of contacting either Emily or James. At the Shierses' criminal trial, the justice court judge dismissed the charges against both of them, finding that there were "no facts or events that were proven *or could have been proven* as to the intentional nature element" of the crime of malicious mischief. (Emphasis added). Indeed, substantial evidence indicates that the leak was wholly accidental and that the Shierses acted promptly to address the issue once it was brought to their attention. Under these circumstances, the circuit court judge's finding of a want of probable cause is not clearly erroneous.[6]

## II. Credibility Determinations

¶35. In his second issue on appeal, Magyar contends that the trial judge "erred in adopting [the Shierses'] distorted characterization of events leading to criminal charges without acknowledging [Magyar's] trial testimony, thus potentially misrepresenting the chronology and context of the case." This argument focuses on James's testimony, arguing that James's "credibility was completely compromised." Specifically, Magyar argues that the "evidence showed that James swore to an acknowledgment of interrogatory responses in 2017, *in this*

---

[6] Magyar places great weight on the fact that two different justice court judges signed arrest warrants in this case. *See supra* note 1. However, the warrants were both based on Magyar's sworn, ex parte allegation that the Shierses had *intentionally* damaged his property. After trial, the latter judge found *no evidence* to support Magyar's allegation. The mere issuance of a warrant based on the defendant's ex parte allegations obviously cannot suffice to conclusively establish probable cause for purposes of the tort of malicious prosecution. *See, e.g.*, *Nassar v. Concordia Rod & Gun Club Inc.*, 682 So. 2d 1035, 1038-39, 1046 (Miss. 1996) (reversing the grant of summary judgment in a malicious prosecution case in which a justice court had issued an arrest warrant); *George*, 937 So. 2d at 960, 964 (¶¶5, 19) (reversing the grant of summary judgment in a malicious prosecution case in which a municipal court had issued an arrest warrant).

15

*action* indicating that he was not the convict of a crime, when in fact he was as his interrogatory responses were signed *two years prior* to actually having the conviction expunged in 2019."

¶36. The background for Magyar's argument is that in 2012, James was convicted of simple assault for striking his then-brother-in-law at a family gathering. In February 2019, the conviction was expunged. However, in November 2017, James had signed interrogatory responses in which he stated that he did not "have any convictions." At the circuit court trial, Magyar impeached James with his interrogatory responses, and James admitted that his conviction had not yet been expunged when he signed his interrogatory responses. Emily later explained that she and James had hired multiple lawyers to pursue expungement of James's record. Emily testified that they understood that the expungement "had been completed" at one point, but they later learned that was not the case. They then hired a new lawyer to complete the expungement. The Shierses argue that James signed his interrogatories at a time when he incorrectly believed that the conviction had already been expunged. On appeal, Magyar argues that the circuit judge should have rejected James's testimony because James's failure to disclose his prior conviction demonstrated that he was not a credible witness.

¶37. Magyar's argument is without merit for several reasons. To begin with, as stated above, "the circuit court, in its role as the finder of fact, has the *sole authority* for assessing witness credibility." *Phillips*, 368 So. 3d at 323 (¶20) (emphasis added) (quotation marks omitted). We defer to the trial judge on matters of credibility because

16

[t]he trial judge saw the[] witnesses testify. Not only did [s]he have the benefit of their words, [s]he alone among the judiciary observed their manner and demeanor. [Sh]e was there on the scene. [Sh]e smelled the smoke of battle. [Sh]e sensed the interpersonal dynamics between the lawyers and the witnesses and [her]self. These are indispensable.

*Culbreath v. Johnson*, 427 So. 2d 705, 708 (Miss. 1983). Moreover, "[t]he mere fact that evidence is developed tending to impeach a witness does not mean that the [fact-finder] is required to reject the witness's testimony." *McNeal v. State*, 757 So. 2d 1096, 1098 (¶5) (Miss. Ct. App. 2000). Rather, "[s]uch impeachment is for the purpose of aiding the [fact-finder] in determining what weight and worth it will give to the evidence offered by that witness." *Id.* In the present case, nothing about James's testimony was so unreasonable or implausible as to be utterly unbelievable; rather, this was an ordinary issue of credibility and impeachment to be assessed by the trial judge, not this Court. Moreover, Emily corroborated virtually all of James's testimony. In these circumstances, there is no basis for this Court to second-guess the circuit judge's credibility determinations.

¶38. Magyar also argues that James suffered no substantial "reputational damage" because James's "prior publicized arrest and conviction" had already damaged his reputation. However, the mere fact that James had a prior misdemeanor conviction (since expunged) did not preclude the trial judge from finding that he had suffered reputational damage and emotional distress as a result of his unwarranted, publicized arrest for malicious mischief.

### III. Punitive Damages

¶39. In his third and final issue on appeal, Magyar asserts that the trial court "erred in finding and awarding punitive damages." Magyar asserts that "[t]here simply was not

17

sufficient evidence to find by clear and convincing evidence" that Magyar acted with malice or recklessness.

¶40.    Our punitive damages statute provides that such damages may be awarded if the plaintiff proves by clear and convincing evidence that the defendant "acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65 (Rev. 2019). In a malicious prosecution case decided prior to the statute's enactment, our Supreme Court held that the trial court erred by refusing to submit the issue of punitive damages to the jury because "[t]he same factual evidence of malice [that was] sufficient to undergird the jury's positive finding of that element of the tort of malicious prosecution should at least suffice to submit the question of a punitive damage assessment to the jury." *Royal Oil Co. v. Wells*, 500 So. 2d 439, 450 (Miss. 1986). However, in a case decided after the statute was enacted, the Supreme Court held that even though the evidence was sufficient to support the jury's finding of malice, "the trial court, as the gatekeeper of whether the issue of punitive damages is to be submitted to the jury, correctly determined that" a reasonable juror could not find by clear and convincing evidence that punitive damages were warranted. *Alpha Gulf Coast Inc. v. Jackson*, 801 So. 2d 709, 734 (¶92) (Miss. 2001); *see id.* at 721-22 (¶¶34-38) (finding sufficient evidence of malice).

¶41.    Because this case was tried without a jury, the issue on appeal is not whether there was sufficient evidence to submit the issue to a jury but only whether the circuit judge's ultimate finding that punitive damages were warranted was clearly erroneous. For the

18

reasons already discussed above, substantial evidence supports the circuit judge's findings that Magyar acted with malice, in reckless disregard of the Shierses' rights, and without probable cause in instituting criminal proceedings against the Shierses. The same evidence also supports the circuit judge's finding that punitive damages were warranted. Accordingly, we find no clear error in the circuit judge's award.[7]

**CONCLUSION**

¶42. The circuit judge did not clearly err by finding Magyar liable for malicious prosecution or by awarding punitive damages.

¶43. **AFFIRMED.**

---

[7] In his statement of issues and argument summary, Magyar only challenges the circuit judge's award of "punitive damages." In the body of his brief, Magyar briefly attacks the circuit judge's "awards for reputational, mental anguish and emotional distress damages," arguing that these awards were arbitrary and "random." However, any challenge to the circuit judge's compensatory awards is procedurally barred because it is not included in Magyar's statement of issues on appeal. *See, e.g.*, *Houston v. Houston*, 385 So. 3d 820, 825 n.1 (Miss. Ct. App. 2024). In any event, our Supreme Court has observed that

> the very nature of the tort [of malicious prosecution] is such that, when committed, *it will inflict mental anguish and emotional distress upon the Plaintiff.* This is one of the major elements of injury or loss of party the victim of a malicious prosecution will suffer and for which she will be entitled to redress. Furthermore, the nature of the tort is such that it will seldom produce an impact or physical injury.

> In the above context, our cases have long recognized that a plaintiff in a malicious prosecution action may recover damages for harm to reputation resulting from the accusation brought against him and mental anguish or distress causally resulting from the malicious prosecution.

*Royal Oil Co.*, 500 So. 2d at 448 (emphasis added). Given the Shierses' testimony regarding the circumstances of their arrests and the emotional distress it caused, substantial evidence supports the circuit judge's awards for mental anguish and emotional distress.

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**